LEVINSON, Judge.
The present appeal arises from a district court order modifying child custody, holding plaintiff Elizabeth Tandy LaFell in criminal contempt of court, and awarding attorneys' fees to defendant Alan Scott LaFell. We dismiss in part and reverse and remand in part.
The evidence presented at the hearing on Mr. LaFell's motions to modify custody and show cause for contempt is summarized in the trial court's findings of fact, all of which are set forth in this opinion. For the reasons discussed infra, at 16-18, the underlined portions of the following "findings" are not considered in our analysis:
3. The [p]laintiff is a citizen and resident of Mecklenburg County, North Carolina.
4. The [d]efendant is a citizen and resident of Moore County, North Carolina.
5. The parties were formerly married and are now divorced.
6. The parties are the parents of three minor children, [A.S.L.], born April 1, 1994, [R.A.L.], born July 15, 1999[,] and [S.B.L.], born July 15, 1999. Presently, the custody of the minor children is governed by a custody order entered on August 14, 2002 and signed October 7, 2002 by the Honorable Michael A. Sabiston, District Court Judge.
7. The prior custody order provides that the [p]laintiff and the [d]efendant shall have joint custody of the minor children with the [p]laintiff having the primary physical custody of the minor children and the [d]efendant having secondary custody of the minor children every weekend from 5:00 PM Friday until 5:00 PM Sunday. The custody order is incorporated herein by reference. On February 13, 2003 the undersigned [d]istrict [c]ourt [j]udge heard the [d]efendant's Motion to Modify Custody and dismissed the [d]efendant's Motion to Modify Custody at the close of the [d]efendant's evidence because there had not been a substantial change in circumstances effecting [sic] the minor children.
8. During the weekend preceding the February 13, 2003 hearing the minor children had been visiting in the home of the [d]efendant and had been returned to the [p]laintiff on February 9, 2003.
9. At the February 13, 2003 hearing the [p]laintiff testified that she had taken the minor children [R.A.L.] and [S.B.L.] to a physician for an examination because of concerns regarding possible sexual abuse of the minor children.
10. The [p]laintiff did not testify in detail regarding circumstances regarding possible abuse of the minor children. At the February 13, 2003 [hearing] neither the [p]laintiff nor her attorney asked the court for any type of emergency modification of the custody order because of any abuse of the minor children. On February 14, 2003 the undersigneddistrict court judge was approached by Stephan Lapping and Arthur Blue with Mr. Lapping requesting an Emergency Ex Parte Order suspending the [d]efendant's visitation with the minor children because of alleged sexual abuse of [R.A.L.] and [S.B.L.].
11. On February 14, 2003 the undersigned [d]istrict [c]ourt [j]udge did not grant the [p]laintiff's Motion for an Ex Parte Order suspending visitation because of the fact that the parties were both present in court the day before and the [p]laintiff offered no evidence at that time regarding the nature of any abuse of the minor children and did not ask for any modification of the [d]efendant's visitation at that time.
12. During January and early February 2003 [R.A.L.] and [S.B.L.] suffered various illnesses and as part of th[e] treatment for the illnesses both the [p]laintiff and the [d]efendant took their temperature using a rectal thermometer.
13. During these sicknesses and because of the vomiting of [R.A.L.] and [S.B.L.] the [p]laintiff administered suppositories to [R.A.L.] and [S.B.L.].
14. On February 9, 2003 when the minor children returned from a visit from the [d]efendant's home the [p]laintiff testified that [R.A.L.]'s vaginal area and her anus were swollen. The [p]laintiff further testified that [R.A.L.] stated that Mr. LaFell [defendant] put his finger in her anus again and again until it bled. [R.A.L.] said that the [d]efendant did this to punish [R.A.L.] because she had made a mess. The [p]laintiff testified that she saw no blood at that time.
15. The [p]laintiff took [S.B.L.] and [R.A.L.] to Mint Hill Family Practice on February 10, 2003 where [R.A.L.] was seen by Doctor Michael Hoben. Doctor Hoben's notes which were admitted into evidence reflect that [R.A.L.] told the [p]laintiff[,] "I got in trouble and Papa put his finger in my butt until it bled." The [p]laintiff further stated that [R.A.L.] told her that he had touched her "pee pee area and that he put his finger there too and it hurts to pee." Doctor Hoben's notes further reflected the [p]laintiff reported the child seems to urinate without difficulties. Dr. Hoben's notes further stated that "according to Mrs. LaFell[plaintiff], the children refer to the paternal grandfather as Papa." Dr. Hoben's notes reflect that he interviewed [R.A.L.] and [R.A.L.] said "Daddy put his finger in my butt and blood came out" and "he did it as an accident."
16. Doctor Hoben's notes regarding [R.A.L.] on February 10th did find some vaginal irritation and Doctor Hoben focused on the cause of the irritation as possible reaction to a detergent (soap) exposure.
17. Doctor Hoben's notes regarding [R.A.L.] on February 10, 2003 did not reflect any swelling or bleeding of the anus and state "anus is patent without evidence of laceration, trauma, irritation ulceration discharge."
18. The [p]laintiff also had [S.B.L.] examined on February 10, 2003 by Doctor Hoben. Doctor Hoben's notes, which were admitted into evidence, state that the [p]laintiff reported the child said that the paternal grandfather had rubbed "my butt." The minor child denied that anyone had touched her anywhere to Doctor Hoben. Doctor Hoben's notes regarding [S.B.L.] on February 10, 2003 reflect a normal exam with no evidence of trauma, laceration, ulceration discharge of the vaginal introitus. Further Doctor Hoben's notes report that the anus is patent without evidence of laceration, trauma, irritation, ulceration or discharge.
19. The [p]laintiff reported what she perceived as abuse to the Mecklenburg County Department of Social Services on February 10, 2003.
20. This [c]ourt has no evidence that any juvenile petition was filed by Mecklenburg County Department of Social Services alleging that the minor children are abused, neglected or dependent. Nor is there any evidence that the Mecklenburg Department of Social Services has an active case involving the minor children.
21. On March 10, 2003 Margaret Gatlin, the [p]laintiff's sister, took the minor children to Mint Hill Family Practice where the children were examined by Doctor Michael Hoben. Ms. Gatlin provided Doctor Hoben with a written statement (a copy is in Dr. Hoben's notes for both children) that on March 10, 2003 [S.B.L.] stated to her that "Daddy put his finger in my butt again, and again, and again and it bled." Ms. Gatlin also said that[S.B.L.] stated that Alisha (the [d]efendant's girlfriend) had put her finger in [S.B.L.]'s "butt" as well. Ms. Gatlin also stated that [S.B.L.] said that it had happened three times. Ms. Gatlin also stated that [R.A.L.] said that "Alisha put her finger in my butt."
22. Doctor Hoben's examination of [S.B.L.] on March 10, 2003 did not note any bleeding or cuts regarding the child's anus. Doctor Hoben's report states "I do not find significant physical evidence to suggest abuse at this time." Doctor Hoben recommended to Ms. Gatlin that the children be evaluated by a child abuse specialist.
23. Doctor Hoben in his report of March 10, 2003 regarding [S.B.L.], says that [S.B.L.] stated "daddy punched me all over in the face and all over." Doctor Hoben asked [S.B.L.] if that was all daddy did and she replied "no he stuck his finger in my butt three times." [S.B.L.] stated that it hurt and bled.
24. [S.B.L.] stated that Alisha had put her finger in [S.B.L.]'s vaginal area.
25. Doctor Hoben's examination report of [R.A.L.] on March 10, 2003 revealed that "daddy punched my [sic] all over two times" and that daddy "stuck his fingers in my butt too." [R.A.L.] did not report any bleeding. Doctor Hoben's report indicated a normal physical examination and further stated "I do not find any significant physical evidence to suggest abuse at this time." Doctor Hoben recommended to Ms. Gatlin that "the children be evaluated by a child abuse specialist."
26. The [p]laintiff took the minor children [R.A.L.] and [S.B.L.] to Doctor William Stewart at Sandhills Pediatrics in Southern Pines for an examination on March 3, 2003. Doctor Stewart examined [R.A.L.] on March 3, 2003 and testified at trial that there was no physical evidence of abuse to the vaginal exam [sic] and that while there was not a full exam of the anus his report noted that in regard to the anus there was no laxity or lesion noted. On March 3, 2003 Doctor Stewart made a note of possible sexual abuse. Doctor Stewart recommended that visitation be suspended until a full evaluation including a child mental health evaluation can [sic] be accomplished. Doctor Setweart examined [R.A.L.] again on March 28, 2003. [R.A.L.] wasbrought to Doctor Stewart's office by Melanie Cooper and Victoria Foard who were babysitters. Doctor Stewart's notes on March 28, 2003 reflect that one of the babysitters reported that [R.A.L.]'s vaginal area was swollen. Doctor Stewart's notes on the March 28, 2003 examination of [R.A.L.] note "tissue of vaginal are pink and normal appearing, no bruise or laceration." Doctor Stewart's notes also reflect and Doctor Stewart testified that [R.A.L.] made an un prompted [sic] statement that "my Daddy didn't do it he didn't put his finger in." Doctor Stewart's notes do not reflect that [R.A.L.'s] vaginal area [was] swollen as described by the babysitter.
27. Doctor Stewart also examined [S.B.L.] on March 28, 2003. Doctor Stewart's notes reflect that Victoria Foard the babysitter claimed that [S.B.L.] had scratches around her anus. Doctor Stewart's notes [sic] and Doctor Stewart testified that there was no bruising or swelling and no anal lesion or laxity. Doctor Stewart testified that it was a normal physical exam and there was no physical evidence of abuse.
28. Doctor Stewart's notes of March 28, 2003 reflect that [S.B.L.] announced "daddy stuck his finger in my butt." Doctor Stewart's notes also state "[S.B.L.] says according to the babysitter they are not supposed to tell."
29. On March 27, 2003, the [p]laintiff, with her sister Margaret Gatlin, the babysitters, Melanie Cooper, Victoria Foard along with [S.B.L.] and [R.A.L.] were seen at Carolina Medical Center by Christopher T. Ragsdale, SMW, LCSW for an evaluation for possible sexual abuse.
30. Mr. Ragsdale reports that [R.A.L.] stated that her daddy stuck his finger in her butt which [R.A.L.] identified as her rectum and her genitalia.
31. In regard to Mr. Ragsdale's interview with [R.A.L.] he noted "this clinician attempted to further assess the patient's understanding of truth and fabrication." This Clinician was unable to determine whether the patient had a firm grasp of this concept.
32. [R.A.L.] also described her father putting a "stick in her butt." Mr. Ragsdale noted in his report "during the course of [R.A.L.]'s assessment she wasvery distracted." This clinician is also aware that the interview environment on this date may not have been conducive to this patient providing valid information secondary to a stressful emotional environment created by the patient's mother and additional care givers [sic] accompanying the child to the PRC. [R.A.L.] describes information that includes fantastic components. These components may be related to concerns about her grandmother and may be indicative of the stress generated by family turmoil.
33. Mr. Ragsdale's report further states "statements provided by [R.A.L.] are concerning yet they are not necessarily diagnostic of abuse." Agencies responsible for decision making should also consider that though [R.A.L.] provides details of inappropriate contact they are consistent with the dynamics of abuse that determinations of actual occurrences are impacted by the complicating factors of memory suggestibility stress and the motivating factors of the parties involved. Information provided by [R.A.L.] is woven in the context of a complex divorce and custody dispute and requires a more extended evaluation.
34. The [p]laintiff related to Mr. Ragsdale her concern regarding the [d]efendant's "extensive collection of pornography." Mrs. LaFell [plaintiff] indicated that she and her sister Ms. Gatlin had removed the pornography collection from the home. When questioned further about . . . this pornography collection Mrs. LaFell indicated that it had been stolen from Ms. Gatlin's automobile.
35. During the trial Mr. Lapping[,] the [p]laintiff's attorney[,] questioned Mr. LaFell about his possession of pornography. Mr[.] LaFell indicated that he might have had one or two pornographic tapes which he and the [p]laintiff had viewed during the course of the marriage. At this point during the trial Ms. Gatlin left the courtroom and returned with a cardboard box the approximate size of a banker's box and placed it on the counsel table in front of the [p]laintiff. The [p]laintiff proceeded to remove several video tapes and other items from the box. On redirect examination, Mr. LaFell was asked by Mr. Blue if he wanted to make any comments or revise his testimony regarding his possession of pornography and Mr. LaFell, the [d]efendant, stated that he did not wish to revise his statements regarding his possession ofpornography and that he did not know what was in the box which Mrs. LaFell had in front of her. The items contained in the box were never presented as evidence. The court notes that there was no further evidence regarding Mr. LaFell's possession of pornography or the [p]laintiff's possession of Mr. LaFell's "alleged collection of pornography."
36. The [p]laintiff did testify that Mr. LaFell did view pornography and had requested that she engage in deviate sexual acts both with Mr. LaFell and a proposed internet web site for money.
37. The court takes notice of the request of the [d]efendant's attorney that Mr. LaFell [defendant] in his counterclaim prayed for custody of the minor children and asserted he was fit and proper to have custody of the children. At no time in this action has Mrs. LaFell [plaintiff] raised any issue regarding Mr. LaFell's fitness and there has been no allegation of Mr. LaFell's proposed use of pornography or deviate sexual acts. The court further notes the parties entered into a consent order which states that Mr. LaFell is a fit and proper person to have visitation with the minor children.
38. By consent of all parties the LaFell family including all of the minor children, the parties, Mrs. LaFell's sister and the babysitters engaged in a child mental health evaluation at the UNC School of Medicine in Chapel Hill.
39. During the course of the mental health evaluation visitation between the minor children and Mr. LaFell was suspended by agreement of the parties. Between March 2003 and September 2003 the [d]efendant, Mr. LaFell[,] was allowed by agreement to have telephone contact with the minor children. Mr. LaFell attempted to call the minor children ninety[-]two (92) times between January 24, 2003 and August 20, 2003. The vast majority of these calls lasted only one to two minutes and only on two occasions was Mr. LaFell successful in speaking with the minor children for more than five minutes.
40. During the summer of 2003 the [p]laintiff moved to a new residence in Mecklenburg County. The [p]laintiff did not inform the [d]efendant of her move nor did she provide him with a new telephone number or address.
41. Nancy Berson, a clinical instructor at the University [of] North Carolina Department of Psychiatry and Diana Meisburger, PHD[,] with the University [of] North Carolina Psychology Department conducted the child mental health evaluation and testified regarding their report.
42. The University [of] North Carolina School of Medicine report of child mental health evaluation was accepted and entered into evidence.
43. The report states "[i]n our clinical opinion the weight of the information obtained through out [sic] this evaluation leads to the conclusion that [R.A.L.] and [S.B.L.] have not been sexually abused. Rather their statements and behavior can likely be explained by the following:
(a) Over[-]interviewing by multiple care givers [sic] and professionals[;]
(b) [S]uggestive questioning combined with their young age and suggestibility[;]
(c) Their need to prove their loyalty to their mother[;]
(d) An over[-]focus on health concerns (particularly their genitalia)[;]
(e) Child care changes and instability in Elizabeth LaFell's household composition[;]
(f) The mis-interruption [sic] of statement and behaviors that had other explanations[;]
(g) The dynamic of a high conflict divorce[.]
The evaluators based their conclusions on several factors included in their report which is incorporated herein by reference.
44. During the course of the evaluation process the evaluators interviewed [S.B.L.][;] [S.B.L.] stated that her father "didn't hurt me at all" [and] "I really want to go back to daddy's." [S.B.L.] then repeated that her daddy didn't hurt her and denied that he had put a pin in "her butt." In a second interview [S.B.L.] was asked what she had told the evaluator about daddy last time. She replied "he didn't do nothing[.]" [S]he denied having told her mommy that her daddy had touched her and hurt her "butt." Again [S.B.L.] denied that her daddy broke touching rules[,] denied he touched pee pees or bottoms[,] and denied she had problems with her daddy.
45. In the evaluators['] interview with [R.A.L.], [R.A.L.] stated that her mother worried that "daddyhurt me if I go back there." [R.A.L.] was asked how her daddy, Scott[,] bothered her and she stated "I just don't know." [R.A.L.] stated that her father said bad things, but when asked, she did not know what her daddy said that was bad. [R.A.L.] was asked if daddy bother[ed] any parts of her body. She nodded yes and pointed to her buttocks. [R.A.L.] indicated that her daddy had bothered her pee pee spot and her "body" (buttocks). She couldn't remember what her daddy had done to bother those parts of her body. [R.A.L.] denied having fun with her daddy and did not want to see him. [R.A.L.] stated that her mother would say "no no no" about [R.A.L.]'s seeing her father. [R.A.L.] denied knowing Alisha.
46. Ms. Berson testified that one of the problems in this case was the number and types of interviews that the minor children have had. She stated that there is a need to be careful with interview technics [sic] with young children and that children took cues from the interviewers.
47. Ms. Berson interviewed [A.S.L.]. During the interview [A.S.L.] told Ms. Berson that the [p]laintiff told him that Mr. LaFell's parents did not love him and that Mr. LaFell was leaving the family for another woman. He also stated that his mother told him that he had not been abused but he might be abused by his father later.
48. In July 2003 Ms. Berson told the Guardian Ad Litem, Mr. Alley, that she thought the visitation with the minor children should resume. Ms. Berson testified that Mr. Alley reported back to her that the [p]laintiff, Mrs. LaFell[,] would not allow the visitation.
49. The evaluation report states that "[n]ot one of the Maternal Family Members, including the Maternal Grandmother, a retired third grade teacher, acknowledged that there were factors other than sexual abuse that contributed to the onset of the behaviors viewed." The behaviors of the minor children were further reviewed in the report. The evaluators testified that they included the [p]laintiff, Mrs. LaFell, in this statement regarding her failure to acknowledging [sic] other factors than sexual abuse.
50. The evaluation recommended that Elizabeth LaFell and her family must accept the possibility thatthey have erred in their perspective and interpretation regarding the issue of sexual abuse. Ms. LaFell, the [p]laintiff, testified that she believes that the [d]efendant molested the children and she disagrees with the UNC opinion that the children were not sexually abused. When asked if she could accept the possibility that the children were not abused, Ms. LaFell stated that someone would have to convince her.
51. On July 31, 2003 the minor children [S.B.L.] and [R.A.L.] were at UNC for part of the evaluation. After the interview [R.A.L.] and [S.B.L.] had an unannounced visitation with the [d]efendant[,] Mr. LaFell. Neither [S.B.L.] or [R.A.L.] nor any member of the [p]laintiff's family knew that Mr. LaFell would be there for a supervised visit. [R.A.L.] and [S.B.L.] were happy to see their father and were excited to visit with him. The girls also had a good visit with Mr. LaFell's new wife Alisha. [A.S.L.] [a]lso had a good visit with the [d]efendant although he was initially guarded. During this visit [R.A.L.] and [S.B.L.] showed no fear of their father nor any hesitation to be with him.
52. Although the [p]laintiff[,] Mrs. LaFell[,] had taken the minor children to Carolina Medical Center for sex abuse evaluation, Mrs. LaFell denied having any knowledge of Mr. Ragsdale's conclusion or report until early September of 2003. Mrs. La[F]ell did not follow up with Mr. Ragsdale, nor did she make further inquiry as to his findings or report.
53. On March 14, 2003 [R.A.L.] and [S.B.L.] were hospitalized in Charlotte. The [d]efendant went to the hospital to visit with the minor children and was met by a security guard who stated "If you cause trouble I will escort you out." Mr. LaFell had never seen the security guard before nor had any contact with him. Mr. LaFell presented a copy of his custody order and stated that he wanted to visit with the minor children. Mr. LaFell was allowed to visit with his children for five minutes with the security guard and a nurse present in the room along with Mrs. LaFell.
54. Mrs. LaFell testified that it was hospital policy for the security guard to be present during Mr. LaFell's visitation. The hospital records regarding the hospitalization on March 14, 2003which were admitted into evidence reflect that Mrs. LaFell insisted that the security guard remain in the room during the visitation.
55. Mrs. LaFell is currently employed as a nurse and she testified that she works three days a week[,] currently Tuesday, Wednesday, and Sunday. That her shifts are for twelve hours and that she has approximately one to one and one-half hours commute each way. While she is working Mrs. LaFell employs various babysitters to care for [the] children[,] and during some days the children are dropped at the babysitter[']s early in the morning and Mrs. LaFell does not return until 10:00 P.M.
56. The court finds that since the entry of the custody [order] of August 2002, Mrs. LaFell has employed as many as five different babysitters to care for the children. The court further finds that during the fall of 2002 the [p]laintiff was residing with Joe Salisbury. The court finds that Mr. Salisbury was a good influence on the [p]laintiff and [d]efendant and increased their ability to communicate. The court further finds that Mr. Salisbury provided the majority of the child care for the minor children while they were in [p]laintiff's custody. Mr. Salisbury and the [p]laintiff separated in late October of 2002.
57. In addition to the babysitters and Mr. Salisbury, the [p]laintiff's sister Margaret Gatlin has provided care and babysitting services for the minor children.
58. The [d]efendant[,] Mr. LaFell[,] has remarried and his current wife is Alisha LaFell. Mr. LaFell works 36 hours a week in 12 hour shifts. Alisha LaFell work [sic] 2 days a week for 12 hours a days [sic]. Mr. LaFell and Alisha LaFell's work schedules may overlap occasionally. During this work overlap Mr. LaFell's mother would care for the minor children. As reflected in previous orders the [p]laintiff moved from Moore County to Charlotte in the summer of 2002 and did not inform the [d]efendant of the move nor inform the [d]efendant of her residence or telephone number.
59. That Mrs. LaFell has a history and pattern of interfering with the visitation between Mr. LaFell and the minor children. Mrs. LaFell has engaged in a pattern of behaviors that have interfered with and damaged the relationship between Mr. LaFell andthe minor children and these actions have harmed the children.
60. That, with the consent of all parties, this [c]ourt appointed Robert L. Alley as Guardian Ad Litem for the minor children due to the evaluation at UNC and the need for an impartial person to facilitate the travel and appointments with UNC. Mr. Alley arranged transportation for the children, spoke with the children, attempted to arrange supervised visits at the direction of the UNC evaluators, and observed them during the times he was with them. Because of his involvement in the matter, Mr. Alley was allowed to make a closing argument and he presented a written report which was admitted without objection. The court reviewed the report but did not consider the report in making any findings of fact or conclusions in this matter.
61. That Arthur M. Blue has represented the [d]efendant in this matter and the [c]ourt incorporates the Affidavit of Arthur M. Blue as to the expenses and time involved in the representation of the [d]efendant in the matter since the filing of the [R]ule 59 motion in February, 2003. The Court finds that Arthur M. Blue has practiced law since August of 1990 and devotes a substantial amount of time to the practice of domestic law in Moore County. The [c]ourt further finds that an hourly rate of $175.00 per hour for an attorney with the experience of Arthur M. Blue is reasonable.
(underlining added).
The trial court concluded that there had been a substantial change in circumstances affecting the welfare of the children and that it was in the best interests of the minor children that primary physical custody be awarded to Mr. LaFell. The trial court further concluded that Mrs. LaFell willfully and knowingly violated the terms of a 7 August 2002 custody order such that she was in criminal contempt of court. The court awarded primary custody to Mr. LaFell, sentenced Mrs. LaFell for criminal contempt, andordered Mrs. LaFell to pay attorney's fees. From this order, Mrs. LaFell now appeals.
In her first argument on appeal, Mrs. LaFell contends that the trial court violated her due process rights by denying her motion to continue. This argument is not properly before this Court because no appeal has been taken from the denial of the motion to continue.
Rule 3(d) of the North Carolina Rules of Appellate Procedure requires that a notice of appeal "designate the judgment or order from which appeal is taken." Proper notice of appeal is a jurisdictional requirement that may not be waived by this Court. Farm Credit Bank v. Van Dorp, 110 N.C. App. 759, 761-62, 431 S.E.2d 222, 224 (1993); Von Ramm v. Von Ramm, 99 N.C. App. 153, 156-57, 392 S.E.2d 422, 424 (1990). As a general rule, an appellate court obtains jurisdiction only over the rulings specifically designated in the notice of appeal as the ones from which the appeal is being taken. Rite Color Chemical Co. v. Velvet Textile Co., 105 N.C. App. 14, 17, 411 S.E.2d 645, 647 (1992). However, there are two situations in which the appellate court may liberally construe a notice of appeal to determine it has jurisdiction over a ruling not specified in the notice. Von Ramm, 99 N.C. App. at 156-57, 392 S.E.2d at 424. First, if the appellant made a mistake in designating the intended judgment, then the appeal will not be dismissed if the appellant's intent to appeal from the proper judgment can be fairly inferred from the notice and the appelleewas not misled by the mistake. Id. Second, if the appellant technically fails to comply with procedural requirements in filing papers with the court but accomplishes the functional equivalent of the requirement, then the court may find compliance with the rules. Id.
In the instant case, Mrs. LaFell's written notice of appeal states that she is appealing "from the order of the Honorable Lee W. Gavin . . . entered on November 3, 2003 . . . holding [her] in Contempt of Court, and Modifying Child Custody." Her notice of appeal makes no mention of the order denying her oral motion for a continuance rendered 9 September 2003 and filed 3 October 2003. As such, Mrs. LaFell's notice of appeal does not vest this Court with jurisdiction to review the denial of her oral motion to continue, and no exception to this requirement is implicated. This assignment of error is dismissed.
In her second and third arguments on appeal, Mrs. LaFell contends that the trial court improperly recited the evidence presented instead of making necessary evidentiary findings, and that the trial court's conclusions of law are not supported by sufficient findings of fact. We agree.
The North Carolina Rules of Civil Procedure mandate that "[i]n all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment." N.C.G.S. § 1A-1, Rule 52(a)(1) (2003). "Under Rule 52(a)(1), the'facts required to be found specially are those material and ultimate facts from which it can be determined whether the findings are supported by the evidence and whether they support the conclusions of law reached.'" Guilford Co. Planning and Dev. Dept. v. Simmons, 102 N.C. App. 325, 326, 401 S.E.2d 659, 660 (1991) (quoting Quick v. Quick, 305 N.C. 446, 451, 290 S.E.2d 653, 657 (1982)). "The court must make its own determination as to what pertinent facts are established by the evidence rather than merely reciting what the evidence may tend to show." Lee v. Lee, 78 N.C. App. 632, 633-34, 337 S.E.2d 690, 691 (1985). On appeal, this Court reviews a trial court's order modifying child custody for whether the trial court has made proper findings, which are supported by substantial evidence, and for whether the trial court's factual findings support its conclusions of law. Shipman v. Shipman, 357 N.C. 471, 475, 586 S.E.2d 250, 254 (2003).
In the instant case, many of the trial court's findings merely summarize the witnesses' testimony and recapitulate the contents of professional witnesses' notes and reports. Specifically, the underlined portions of the trial court's "findings," which are set forth at the beginning of this opinion, do not resolve conflicts in the evidence or state what ultimate facts the trial court finds to be true.[1] Accordingly, we have not considered the underlined material in reviewing the trial court's order for error. The remaining findings do not support the trial court's conclusions of law as to a substantial change of circumstances affecting the welfare of the children and the best interests of the children. Indeed, the order does not resolve central, contested issues in the instant case: whether or not the children were likely abused by Mr. LaFell and the effect, if any, of Mrs. LaFell's alleged inability to accept alternative explanations for the children's alleged behavior if in fact they were not abused. As a further illustration of the court's failure to make actual findings, paragraphs 34, 35 and 36 outline what activities occurred in the courtroom and what persons stated concerning pornography. However, the "findings" do not resolve whether Mr. LaFell had an "extensive" collection of pornography and/or how such a finding relates to the issues of alleged changed circumstances and best interests.
Mr. LaFell, on the other hand, generally argues that the custody order is sufficiently supported because the findings demonstrate that certain professionals found no persuasive indicias of abuse, and because the court received into evidence and recited in paragraph 43 the conclusions of the evaluators at the UNC School of Medicine. Again, however, nothing in the order states what the trial court itself finds to be true.
In short, because the trial court failed to resolve significant conflicts in the evidence as to one or more central issues by making appropriate findings of fact, there can be no basis for the trial court's conclusions either that there was asubstantial change in circumstances affecting the welfare of the children, or that it was in their best interests that custody be modified.
We note that findings of fact thirty-nine and forty address Mrs. LaFell's failure to inform Mr. LaFell about her relocation to another county, and Mr. LaFell's difficulty in speaking with his children while his visitation rights were temporarily suspended. While we observe that such findings may be probative as to the issues of modification and best interests, the trial court's failure to resolve significant conflicts in the evidence as to the alleged abuse, standing alone, leads to the inescapable conclusion that the current order cannot be sustained.
Finally, although the court found that Mrs. LaFell's behaviors "have interfered with and damaged the relationship between Mr. LaFell and the minor children and . . . have harmed the children", we urge the trial court to make more particularized findings concerning how the alleged changed circumstances affected and/or will likely affect the children. See Pulliam v. Smith, 348 N.C. 616, 618-19, 501 S.E.2d 898, 899 (1998) ("`The modification of a custody decree must be supported by findings of fact based on competent evidence that there has been a substantial change of circumstances affecting the welfare of the child.'") (quoting Blackley v. Blackley, 285 N.C. 358, 362, 204 S.E.2d 678, 681 (1974)). The portion of the trial court's order modifying child custody is reversed and remanded for the entry of a new order supported by appropriate findings of fact.
In her fourth argument on appeal, Mrs. LaFell challenges the trial court's decision to hold her in criminal contempt of court. Mrs. LaFell specifically alleges (1) that the court's conclusion that she was in criminal contempt of court was not supported by adequate findings of fact, and (2) that the court erred by holding her in criminal contempt of court without finding "beyond a reasonable doubt" that she had willfully and knowingly violated the terms of a preceding custody order. We agree.
Willful violation of a court order may be punished as criminal contempt of court. N.C.G.S. § 5A-11(a)(3) (2003). For a person to be held in criminal contempt, the factual basis for the contempt "must be established beyond a reasonable doubt." N.C.G.S. § 5A-15(f) (2003). This Court has held that a trial court's order holding a person in criminal contempt of court must indicate that the "beyond a reasonable doubt" standard has been applied to the court's findings of fact. State v. Ford, __ N.C. App. __, __, 596 S.E.2d 846, 849 (2004); State v. Verbal, 41 N.C. App. 306, 307, 254 S.E.2d 794, 795 (1979).
In the instant case, the trial court concluded that Mrs. LaFell "willfully and knowingly violated the terms of the preceding custody order" and that she was "in criminal contempt . . . for her violation of the court order." This is not sufficient to comportwith existing law, as the order itself must indicate the standard of proof employed or else the order of contempt is "fatally deficient."[2] Ford, __ N.C. App. at __, 596 S.E.2d at 850. Moreover, we agree with Mrs. LaFell that the court failed to make findings setting forth what provision(s) of the initial custody order were violated and in what way(s) such provision(s) were violated.
The portion of the trial court's order holding Mrs. LaFell in criminal contempt is reversed. If, on remand, the trial court determines that Mrs. LaFell is in criminal contempt of court, the court must make appropriate findings of fact supporting this determination and indicate that it has applied the correct standard of proof in doing so.
In her fifth argument on appeal, Mrs. LaFell contends that the trial court's findings of fact were insufficient to support an award of attorney's fees against her. We agree.
N.C.G.S. § 50-13.6 (2003) provides that [i]n an action or proceeding for the custody . . . of a minor child, including a motion in the cause for the modification or revocation of an existing order for custody . . . , the court may in its discretion order payment of reasonable attorney's fees to an interested party acting in good faith who has insufficient means to defray the expense of the suit.
An order for attorney's fees pursuant to G.S. § 50-13.6 in an action for child custody must be supported by findings that "the party seeking the award is (1) an interested party acting in good faith and (2) has insufficient means to defray the expense of the suit." Taylor v. Taylor, 343 N.C. 50, 54, 468 S.E.2d 33, 36 (1996); Cobb v. Cobb, 79 N.C. App. 592, 595, 339 S.E.2d 825, 828 (1986). A trial court's award of attorney's fees may be affirmed, despite the failure to make a finding that the party seeking attorney's fees is an interested party acting in good faith, where there is undisputed evidence of this fact. Lawrence v. Tise, 107 N.C. App. 140, 153, 419 S.E.2d 176, 185 (1992). However, "where [a] trial court fail[s] to make a finding of fact as to [a party's] ability to defray the expense of the suit as required by G.S. [§] 50-13.6," the failure to make such a finding requires reversal of the trial court's award of attorney's fees. Rogers v. Rogers, 39 N.C. App. 635, 637, 251 S.E.2d 663, 664 (1979).
In the instant case, the trial court failed to make a finding that Mr. LaFell was an interested party acting in good faith. Unlike the circumstances in Lawrence, supra, this fact is not necessarily established by undisputed evidence in the present record. Moreover, the trial court failed to make the requiredfinding that Mr. LaFell had insufficient means to defray the expense of the child custody action. Accordingly, the trial court's award of attorney's fees is unsupported by necessary findings of fact.
The portion of the trial court's order awarding attorney's fees must be reversed. Assuming arguendo that on remand the trial court orders, and the evidence supports, an award of attorney's fees to Mr. LaFell, the court must make the findings required by G.S. § 50-13.6.
As to all issues that are remanded, the trial court has discretion to determine whether it will accept additional evidence before entering its new order. See Hicks v. Alford, 156 N.C. App. 384, 389, 576 S.E.2d 410, 414 (2003) ("Whether on remand for additional findings a trial court receives new evidence or relies on previous evidence submitted is a matter within the discretion of the trial court.").
Dismissed in part; reversed and remanded in part.
Judges McCULLOUGH and ELMORE concur.
Report per Rule 30(e).

For the purposes of this appeal, we have treated the findings generously, treating as actual findings certain portions that may merely be recitations of what certain other individuals observed, stated or concluded.

This case does not fall within the exception to the general rule that the court must indicate the standard of proof employed, as this proceeding is not a "limited instance where there were no factual determinations for the court to make." Ford, __ N.C. App. at __, 596 S.E.2d at 850 (citation omitted); see also In re Owens, 128 N.C. App. 577, 581, 496 S.E.2d 592, 595 (1998), aff'd, 350 N.C. 656, 517 S.E.2d 605 (1999) (affirming contempt order where trial court failed to indicate the standard of proof applied in holding the witness in contempt for refusing the trial court's instruction to answer an attorney's question because "there was simply no factual determination for the trial court to make").